Eastern District of Kentucky
**F I L E D**
Aug - 30 2024
Robert R. Carr
Clerk, U.S. District Court

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 23-37-DLB-CJS-1

UNITED STATES OF AMERICA                                                                           PLAINTIFF

v.                      **REPORT AND RECOMMENDATION**

SCOTT CORMAN                                                                             DEFENDANT

\*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant Scott Corman's Motion to Suppress (R. 59) and the United States' Response (R. 63). The Court held a two-part evidentiary hearing on April 25, 2024 (R. 73) and May 1, 2024 (R. 76), after which the parties agreed to file post-hearing briefs. (*See* R. 82; R. 83). The Court ordered additional briefing from the Defendant on the United States' probable cause to arrest argument. (*See* R. 84). The Motion is now ripe for consideration and preparation of a Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(B).[1] For the reasons discussed below, it will be recommended that the Motion to Suppress (R. 59) **be denied**.

**I.     FACTUAL AND PROCEDURAL BACKGROUND[2]**

In March 2023, a Confidential Informant ("CI") alerted officers with the Florence Drug Unit ("FDU") of potential drug activity at the My Town Extended Stay hotel in Florence, Kentucky. (R. 79 at Page ID 264). The CI, an employee of My Town, was conversing with another

---

[1]     *See United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

[2]     The factual circumstances presented here are taken from the transcripts of testimony from the two-part evidentiary hearing held on April 25, 2024, at which Officer Jacob Whitford, Officer Dustin Zink, and Officer Nicholas Barkley testified (R. 79), and May 1, 2024, at which Sgt. Timothy Crowley testified (R. 78).

resident when Skyler Baker,[3] unknown to the CI, approached and suggested that the CI go directly to "her man" to purchase narcotics. (*Id.* at Page ID 265). The CI informed law enforcement that Ms. Baker was staying with a man at the hotel, and he parked his silver SUV directly below their room. (*Id.* at Page ID 265-66). Officer Jacob Whitford, the lead investigator, discovered the SUV below the room and checked its registration, which came back as registered to Defendant Scott Corman. (*Id.* at Page ID 266). On March 28, 2023, the CI also identified a photograph over text as Corman, although she did misidentify a picture of him at first. (*Id.* at Page ID 267, 351; *see* R. 59-3).

On March 29, 2023, four FDU officers executed a controlled buy with the CI. (*Id.* at Page ID 271-78). Officer Whitford and Officer Tom Leone met with the CI at a nearby restaurant and after searching her, they equipped her with an audio recording and transmitting device and the $40 cash for the buy. (*Id.* at Page ID 271). The CI had earlier arranged the date and time of the sale. (*Id.* at Page ID 270). After the initial meeting with Officers Whitford and Leone, the CI walked across the street to the hotel and knocked on the door to Corman and Baker's room. (*Id.* at Page ID 272). Officers Whitford and Leone surveilled her as she walked from the restaurant to the street; Officer Anthony McMahan, positioned in an adjacent parking lot, watched her walk from the street to the bottom of the outdoor stairs; Sgt. Timothy Crowley, located in another adjacent parking lot directly facing the hotel, observed her after she reached the top of the stairs to the door of the hotel room. (*Id.*; R. 78 at Page ID 222-23, 230-31).[4]

---

[3]   Skyler Baker was charged as a co-defendant in this case and has since entered a guilty plea to possessing methamphetamine with intent to distribute on December 15, 2023. (R. 41).

[4]   The officers lost visual contact with the CI during the period she was climbing the stairs. (R. 79 at Page ID 272).

2

Once inside, the CI encountered Baker and Corman. (*Id.* at Page ID 275). Corman told her that he could only sell her 0.9 grams, not the full two grams, of methamphetamine since that was all he had left, and that he needed to obtain more from his source in Grant County, Kentucky. (*Id.* at Page ID 276). The CI left the money in the hotel room, Corman retrieved a bag containing methamphetamine from the room, tossed it to the CI, and she departed. (*Id.* at Page ID 275). The CI directly returned to the officers, at which point she was searched again, and the officers removed the audio device and took the methamphetamine. (*Id.*).

The officers instructed the CI to arrange a second controlled buy with Corman, which occurred on April 6, 2023. (*Id.* at Page ID 277-78). The CI met with Officers Whitford and McMahan in their unmarked vehicle. (*Id.* at Page ID 279). The officers searched her, equipped her with an audio device, and provided her with $80 cash. (*Id.* at Page ID 279). Four officers surveilled her until she entered the hotel room, where Corman and Baker were staying. (*Id.* at Page ID 280; R. 78 at Page ID 235). Before entering the room she spoke briefly to Baker through the open window. (R. 79 at Page ID 281). Once inside, Corman left the room and Baker remarked that "[h]e's probably weighing that shit out," and stated that Corman frequently lost items in his SUV's dashboard. (*Id.* at Page ID 282). From this the CI believed that Corman had left to retrieve the narcotics from his SUV. (*Id.*). Upon his return, Corman said "I've got your ball" and he and the CI exchanged the money and methamphetamine. (*Id.* at Page ID 282). Sgt. Crowley, the investigator watching the room, later testified he saw Corman exit the room, but never saw him return.[5] (R. 78 at Page ID 224).

---

[5]  Sgt. Crowley later testified that from his vantage point he could see the door to the hotel room but could not see Corman's SUV. (R. 78 at Page ID 236).

3

After the two controlled buys, Officer Whitford obtained a search warrant and placed a GPS tracking device on Corman's SUV. (R. 79 at Page ID 266, 284). On April 15, 2023, the CI called Officer Whitford and said that she had entered Corman and Baker's room at the hotel to help resolve an argument between the two. (*Id.* at Page ID 284-85). She reported to the officers that at that time she observed a half-ounce to an ounce of methamphetamine on the table in their room. (*Id.*) This prompted Officer Whitford to check the GPS tracking data for Corman's vehicle. (*Id.* at Page ID 285). The data revealed that Corman's vehicle had left the hotel at around 1:11 a.m., had traveled to Ellen Kay Drive in Grant County, Kentucky, and had returned to the hotel at 3:24 a.m. (*Id.* at Page ID 287).

On April 24, 2023, Officer Whitford noticed Corman's vehicle was absent from the My Town Extended Stay hotel in Florence. (*Id.* at Page ID 290). He checked the GPS tracking data, which reflected that Corman's vehicle was now positioned at the Turfside Motel in Florence. (*Id.*). Officer Whitford observed Corman's SUV in the parking lot of the motel and contacted hotel management, who confirmed that a room was under Baker's name. (*Id.* at Page ID 290-91).

The next day, April 25, Officer Whitford examined the GPS tracking data again. (*Id.* at Page ID 293). This time it indicated Corman's vehicle had left the hotel that morning at 3:33 a.m., had traveled to Dayton, Ohio where the vehicle remained until leaving Dayton at 4:44 a.m. (*Id.* at Page ID 293). From there, Corman's vehicle traveled to Ellen Kay Drive in Grant County, Kentucky, arriving at 5:53 a.m. (*Id.*). The vehicle left Ellen Kay Drive at 6:31 a.m. and returned to the Turfside Motel at 7:31 a.m. (*Id.*). Believing Corman had just procured a large amount of methamphetamine, Officer Whitford immediately began surveillance of the hotel that morning of April 25, 2023. (*Id.* at Page ID 294).

In the early afternoon, Officer Whitford observed Corman and Baker at the Turfside Motel loading Corman's vehicle with their luggage. (*Id.* at Page ID 296). As they departed the Turfside

4

Motel, Officer Whitford observed Corman's vehicle make a right turn while his left turn signal was activated, in violation of state law. (*Id.* at Page ID 297). Upon observing the traffic violation, Officer Whitford radioed two patrol officers—Officers Dustin Zink and Nicholas Barkley—to initiate a traffic stop. (*Id.* at Page ID 297-98). Officer Whitford followed closely behind the marked patrol car and stayed in constant communication with the patrol officers. (*Id.* at Page ID 298-99).

Officers Zink and Barkley initiated the stop in Elsmere, Kentucky at about 1:08 p.m. (*Id.* at Page ID 298, 370-71). Officer Barkley relayed Corman's license plate to dispatch before approaching the vehicle. (*Id.* at Page ID 371, 391). Officer Zink requested identification from Corman, who was driving, and Baker. (*Id.* at Page ID 371). Corman refused to consent to a search of the vehicle. (*Id.* at Page ID 371). The officers removed Corman and Baker from the vehicle and initiated a pat down for weapons. (*Id.* at Page ID 372). Officer Barkley obtained Corman and Baker's identification and escorted them to the back of the vehicle and Officer Zink retrieved his K-9 partner out of his patrol car, allowed the K-9 to relieve himself, and began a free air sniff of Corman's vehicle. *Id.* at Page ID 373). While Officer Zink was performing the free air sniff, Officer Barkley relayed Corman and Baker's information to dispatch. (*Id.* at Page ID 393). At 1:11 p.m., 1:12 p.m., and 1:16 p.m. dispatch personnel ran database searches of Corman and Baker's driver's licenses and Corman's license plate. (*Id.* at Page ID 395-97; Gov. Ex. 5). The K-9 alerted to the presence of narcotics within five minutes after the initiation of the traffic stop, at the front passenger side, approximately 1:14 p.m., before dispatch had begun a search of Corman's license plate.[6] (*Id.*; *see Id.* at Page ID 378-79, 384). Officer Zink began a search of

---

[6] Officer Zink's body camera was off at the time. He testified that it was within his discretion to turn off his body camera during the free air sniff. (R. 79 at Page ID 378-79).

5

Corman's vehicle while communicating over the radio with Officer Whitford and several other officers with the FDU. (*Id.* at Page ID 374). During the search, Officer Zink discovered a black backpack containing methamphetamine. (*Id.* at Page ID 375). Following the discovery of the methamphetamine, the officers arrested Corman and Baker. (*Id.* at Page ID 303).

On February 13, 2024, Corman filed the instant Motion to Suppress, alleging that the automobile stop was invalid at its inception, since the officers did not have probable cause of a civil infraction nor did they have reasonable suspicion of an ongoing crime. (R. 59). Corman also alleges that the officers had impermissibly exceeded the scope of the traffic stop by abandoning the initial purpose of the stop and performing a drug investigation. (*Id.*). The United States responded that the officers had probable cause to arrest Corman for drug trafficking and that an analysis of the duration of the stop was unnecessary, but even so, the officers had reasonable suspicion to prolong the stop. (R. 63).

A two-part suppression hearing was held on April 25, 2024 (R. 79) and May 1, 2024 (R. 78). After the transcripts were completed for each part of the evidentiary hearing (R. 79; R. 78), the parties filed post-hearing briefs. (*See* R. 81; R. 82). The Court also ordered an additional brief by Corman to address the Government's argument as to the officers' probable cause to arrest Corman. (*See* R. 84). Corman filed his Reply on July 31, 2024. (*See* R. 87). The matter is now ripe for consideration.

**II.    ANALYSIS**

In Corman's post-hearing Memorandum in Support of his Motion to Suppress, he argues that Officers Zink and Barkley did not have probable cause of a civil infraction. He points to Officer Whitford's testimony that he used the wrong turn signal, arguing this contradicts his citation which stated that Corman "failed" to use his turn signal. (*See* R. 82 at Page ID 420). Corman also contends the stop was invalid because the officers had no reasonable suspicion of an

6

ongoing crime. He points to the lack of evidence of drug trafficking out of the Turfside Motel and argues that he was not in the room during the second buy. (*See id.* at Page ID 421-22).

Alternatively, Corman argues that the traffic stop, even if lawful at its inception, unreasonably infringed on his rights under the Fourth Amendment under *Illinois v. Caballes*, 548 U.S. 405, 407 (2005). (R. 82 at Page ID 442-23). He argues that the officers' purpose in stopping him, therefore, was to investigate and search his vehicle, not issue a citation for a failure to signal and that he was unlawfully detained as the officers pretended to perform a traffic stop while actually performing a drug investigation. (*Id.* at Page ID 423).

In its Response, the United States argues that the officers had probable cause, citing *United States v. Lidge*, No. 23-CR-13, 2024 WL 864292, at *2 (E.D. Ky. Feb. 29, 2024) (holding officers had probable cause to arrest based upon three controlled buys), and persuasive authority in *United States v. Hinson*, 585 F.3d 1328, 1335 (10th Cir. 2009) (finding officers had probable cause to arrest after one controlled buy a month prior to the arrest). (*See* R. 83 at Page ID 427). The United States also argues that the officers had probable cause of a civil infraction based upon Officer Whitford's direct observation, and counters that Officer Whitford's seemingly conflicting citation remarks are not inconsistent with his testimony. (*Id.* at Page ID 431). Finally, the United States alternatively posits that even if the officers did not have probable cause to arrest, they collectively had reasonable suspicion of criminal activity to support the traffic stop based upon the two controlled buys. (*Id.* at Page ID 432).

After receiving the United States' Response to Defendant's Post-Hearing Brief (R. 83), the Court ordered Corman to file additional briefing to address the United States' argument that the officers had probable cause to arrest Corman for drug trafficking and thus could stop Corman's vehicle on this basis. In his Reply (R. 87), Corman did not directly respond to the United States' argument. Rather, he focused on continuing to argue that the officers abandoned the traffic stop

7

without reasonable suspicion to continue detaining him and that the search of his vehicle occurred prior to his actual arrest and was thus unconstitutional.  (*See* R. 87).

### A.     Validity of Traffic Stop

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  This protects even "brief investigatory stops of persons or vehicles that fall short of traditional arrest," since stopping and detaining a motorist constitutes a seizure.  *United States v. Chandler*, 437 F. App'x 420, 425 (6th Cir. 2011); *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012).  An officer must have probable cause to initiate a stop for a civil infraction, or reasonable suspicion of an ongoing crime to initiate a stop for a criminal violation.  *United States v. Collazo*, 818 247, 253-54 (6th Cir. 2016); *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).  The reasonableness of a traffic stop is measured by the same reasonable suspicion standard as investigatory stops in *Terry v. Ohio*, 392 U.S. 1 (1968).  *Lyons*, 687 F.3d at 763.  Here, there are three separate arguments as to whether the officers had the authority to institute a traffic stop.

#### 1.     Probable Cause to Arrest and Reasonable Suspicion of Ongoing Criminal Activity

Whether the officers had either probable cause to arrest or reasonable suspicion of ongoing criminal activity will be considered together because of the common factual basis of both claims.  In general, reasonable suspicion involves officers making "commonsense judgments and inferences about human behavior."  *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).  Courts consider the totality of the circumstances when determining whether an officer has developed reasonable suspicion of criminal activity.  *Stepp*, 680 F.3d at 664 (citation omitted).   The officer "must point to specific and articulable facts that are more than an ill-defined hunch." *United States v. Richardson*, 385 F.3d

8

625, 630 (6th Cir. 2004) (internal quotations omitted); *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (internal quotations omitted); *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011). "Police officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Shank*, 543 F.3d at 315; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). The likelihood of criminal activity is obviously less than probable cause, and it falls considerably short of a preponderance of the evidence. *Arvizu*, 534 U.S. at 274 (citations omitted); *United States v. Calhoun*, 834 F. App'x 128, 131 (6th Cir. 2020). "Reasonable suspicion . . . does not present a particularly high bar." *United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019).

In contrast, "[p]robable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006)); *Collazo*, 818 F.3d at 257. Probable cause is a "fluid concept[ ]turning on the assessment of probabilities in particular factual contexts." *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Probable cause exists when "at the moment the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that a suspect had committed or was committing an offense." *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008). Officers have probable cause when they can articulate concrete facts which infer a probability that illegality has occurred. *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). Moreover, probable cause is an "objective standard" analyzed through the "eyes of a reasonable officer." *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021); *United States v. Cooper*, 1 F. App'x 399, 403 (6th Cir. 2001); *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022).

Additionally, "'[p]ractically since the beginning of the Government' officers have been allowed to stop a vehicle on public roads without a warrant when they have probable cause to believe that the occupants have committed a crime." *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021) (quoting *Carroll v. United States*, 267 U.S. 132, 153-56 (1925); *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996). "The Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). An officer also has probable cause to arrest if there is a "fair probability that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

Unlike cases like *Rodriguez v. United States*, 575 U.S. 348 (2015) and *United States v. Richardson*, 385 F.3d 625 (6th Cir. 2004) both of which Corman relies upon to some degree, Corman's arrest occurred after a two-month drug investigation. That investigation produced two controlled buys via a CI deemed "reliable."[7] (R. 79 at Page ID 270-77, 279-83, 306). The audio evidence, while not of stellar quality, generally corroborates the account of the buys relayed to officers in the debriefing. (*See* Def. Ex. 3). Corman sold the CI 0.9 grams of methamphetamine on March 29, 2023, because Corman told her that was all he had left and that he needed to resupply with his source in Grant County. (R. 79 at Page ID 275-76). On April 6, 2023, the officers executed a second controlled buy with Corman, this time for three grams of methamphetamine. (*Id.* at Page ID 278-82). During the second controlled buy, Sgt. Crowley confirmed the CI's account that Corman had left the hotel room to purportedly "weigh out" the methamphetamine in his vehicle, although he did not see Corman return to the room. (R. 78 at Page ID 223-25, 238-

---

[7] Officer Whitford testified that he believed he could have arrested Corman after just the first controlled buy. (R. 79 at Page ID 277).

10

39). After the second controlled buy, officers placed a GPS tracking device on his vehicle, and observed him make an early morning trip to Grant County on April 15, 2023, and again on April 25, 2023, the morning before he was arrested. (R. 79 at Page ID 287, 293-94). The facts of the drug investigation when examined under the "eyes of a reasonable officer" constitute a "fair probability" of criminality and thus probable cause for Officer Whitford to arrest Corman for drug trafficking on April 25, 2023. *Barrera,* 12 F.4th at 620; *United States v. Terry*, 522 F.3d 645, 649-50 (6th Cir. 2008) ("[P]robable cause does not require 'near certainty,' only a 'fair probability.'") (quoting *United States v. Martin*, 289 F.3d 392, 400 (6th Cir. 2002)).

Corman acknowledges in his Motion to Suppress that officers may rely upon information obtained from other officers involved in the investigation to establish probable cause. (R. 59 at Page ID 149) (citing *United States v Duval*, 742 F.3d 246 (6th Cir. 2014)). But Corman mistakenly argues that the totality of the facts here does not rise to the level of probable cause.

When viewed under the totality of the circumstances, the above facts also then create at least reasonable suspicion of ongoing criminal activity for Officers Zink and Barkley to stop Corman's vehicle. *See Lidge,* 2024 WL 864292, at *1-2 (E.D. Ky. Feb. 29, 2024) (holding that police had "probable cause—and certainly reasonable suspicion" to arrest defendant). Reasonable suspicion does not require a "specific suspicion that a suspected drug dealer is en route to a drug transaction or in a vehicle brimming with drugs," *United States v. Sheckles*, 996 F.3d 330, 344 (6th Cir. 2021), since "[o]fficers may stop a suspect not only for criminal prevention purposes, but also for criminal-investigation purposes." *Id.* As a result, Corman's argument that none of the officers saw him with drugs the day of the arrest falls short. *See United States v. Hensley*, 469 U.S. 221, 223 (1985) (holding that a *Terry* stop may be made to investigate reasonable suspicion of a suspect who was already involved in a completed felony); *see also United States v. Bullock*, 632 F.3d 1004, 1014 (7th Cir. 2011) (similarly rejecting the argument that officers may only stop and detain

11

a suspect for reasonable suspicion that the suspect is presently engaging or about to engage in criminal activity).

Under the information presented to law enforcement from their investigation, the officers had both a reasonable suspicion of ongoing criminal activity and probable cause to arrest Corman. Having probable cause to believe the occupants of the silver SUV had committed a crime, officers could stop the vehicle without a warrant for the purpose of arresting Corman for drug trafficking. *United States v. Brooks*, 987 F.3d at 598.

### 2. Probable Cause of a Traffic Violation

In the Sixth Circuit, an officer can also stop a vehicle without a warrant if he has probable cause to believe that an occupant has committed a civil traffic offense. *Lyons*, 687 F.3d at 763 & n.3 (citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)); *United States v. Whren*, 517 U.S. 806, 810 (1996) ("The decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred."). Under Kentucky law, "[a] person shall not turn a vehicle or move right or left upon a roadway until the movement can be made with reasonable safety nor without giving an appropriate signal . . . ." Ky. Rev. Stat. ("KRS") § 189.380(1).

Here, Officer Whitford testified that he observed Corman turn right out of the Turfside Motel while his left turn signal was activated. (R. 79 at Page ID 29). Under these circumstances, Officer Whitford had probable cause to believe that Corman had committed the civil traffic offense of failing to signal in violation of KRS § 189.380. *See United States v. Westmoreland*, 224 F. App'x 470, 473 (6th Cir. 2007) (holding that an officer conducting a vehicle stop had probable cause to believe that a traffic violation had occurred when the driver failed to signal a left turn at an intersection as required by law); *see United States v. Miller*, 413 F. App'x 841, 843 (6th Cir.

12

2011) (upholding finding that officer's stop after observing a failure to signal constituted probable cause even when officer's testimony regarding the direction of suspect's vehicle was inconsistent).

Corman attempts to discredit Officer Whitford's testimony by comparing his testimony at the April 24, 2024, Suppression Hearing (R. 79) to the citation he issued following Corman's arrest. (R. 87 at Page ID 444). In his direct testimony, he testified that Corman "had his left turn signal on and he initiated a right turn" out of the parking lot of the Turfside Motel. (R. 79 at Page ID 297). However, in the uniform citation he issued after he arrested Corman, he states that the "subject fail[ed] to use his turn signal while making a right turn out of the Turfside Motel . . ." (Def. Ex. 8). However, the two are not inherently contradictory. Failing to use a turn signal could also encompass failing to use the *correct* turn signal.

Aside from noting this, Corman has not put forth any evidence or credible contention that a traffic violation did not occur. He may believe any traffic violation was minor and technical, and he may challenge the "true" motivations of the officers in stopping him, but those arguments simply do not undermine the validity of the probable cause conclusion that Corman did not properly signal as required by Kentucky law. The United States has demonstrated that the officers had probable cause of a traffic violation to justify a warrantless automobile stop under *Lyons*.

      **B.**    **Scope and Duration of the Stop**

Since the officers had probable cause to initiate a stop to arrest Corman for drug trafficking, an analysis of the scope and duration of the stop becomes unnecessary. *See United States v. Warfield*, 404 F. App'x 994, 997 n.1 (6th Cir. 2011) (finding that defendant's arrest justified detention for up to ninety days, no need to discuss propriety of extending the stop); *see also United States v. Pratt*, 355 F.3d 1119, 1124 (8th Cir. 2004) (holding that when "officers had probable cause to arrest [suspect], *Terry* is inapplicable"); *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (finding probable cause to arrest justified long detention); *Johnson v. Moore*, No. 3:10-

13

cv-537, 2011 WL 1637079, at *10 (E.D. Va. Apr. 29, 2011) (*Terry* stop scope and duration analysis unnecessary when officers have probable cause). However, since the officers also met both tests to initiate a stop under *Lyons*, a discussion of the scope and duration of the stop is useful as alternate justification.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren*, 517 U.S. at 809-10. A lawful traffic stop must therefore be limited in scope and duration, and if an officer exceeds the scope or duration of the traffic stop, the officer must have "reasonable suspicion" to continue the stop on unrelated grounds. *Rodriguez*, 575 U.S. at 354-55. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022) (quoting *Caballes*, 543 U.S. at 407).

The permissible length of a stop is determined by the "mission" that justifies the stop. *Caballes*, 543 U.S. at 407. The Fourth Amendment tolerates investigations unrelated to the traffic stop that occur during the stop, but only if those unrelated investigations do not prolong the stop. *Id.* at 354 (citing *Arizona v. Johnson*, 555 U.S. 323, 327-28 (2009), and *Caballes*, 543 U.S. at 406, 408). However, prolonging the stop is still permissible if there is reasonable suspicion to do so on grounds unrelated to the traffic stop. *Whitley*, 34 F.4th at 529.

Under *Whren*, an officer's subjective intent is irrelevant, when a traffic stop is supported by probable cause. 517 U.S. at 813. The Sixth Circuit has interpreted this such that a "police officer may stop vehicles for any infraction no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *Collazo*, 818 F.3d at 253 (quoting *United States v. Blair*, 5214 F.3d 740, 748 (6th Cir. 2008).

14

The activities incident to a traffic stop include actions like checking a driver's license, insurance and registration, checking for warrants, and deciding whether to issue a citation. *Rodriguez*, 575 U.S. at 355.  In contrast, activities like open air sniffs have a separate purpose—detecting criminal activity—and are thus divorced from the purpose of the traffic stop.  *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)).  Therefore, open air sniffs and other unrelated activities are permitted, but they must occur "during the supposedly dead time while [the officer] or another officer is completing a task related to the traffic violation."  *United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020).  Because the unrelated activity happens concurrently with the traffic stop activities, the unrelated activity does not add to the total time of the stop.  *Id.*

The United States cites to this Court's decision in *United States v. Vanderpool*, No. 21-66, 2023 U.S. Dist. LEXIS 88957 (E.D. Ky. Mar. 31, 2023), *report and recommendation adopted*, 21-66, 2023 U.S. Dist. LEXIS 87907 (E.D. Ky. May 19, 2023).  In *Vanderpool*, the Court applied *United States v. Salas*, 820 F. App'x 405, 406-07 (6th Cir. 2020) to distinguish *Vanderpool* from *Rodriguez*, thus avoiding the prohibition on prolonging traffic stops to conduct drug investigations.  The *Vanderpool* stop was not merely routine, but rather the very "purpose of the traffic stop . . . include[d] investigation of suspected drug offenses, not just processing the ticket for failure to signal at a turn."  *Vanderpool*, 2023 U.S. Dist. LEXIS 87907, *5.  Because there was an extensive ongoing drug investigation that pre-dated the traffic stop, *Rodriguez*'s prohibition on prolonging traffic stops beyond what is needed simply to issue a ticket would not apply, and the officers were free to reasonably investigate the suspected drug trafficking.  In this case, the purpose or "mission" of the stop was to investigate Corman for drug trafficking.  *See United States v. Howell*, 71 F.4th 195, 202 (4th Cir. 2023) (holding that the purpose of a stop was not routine, but rather to "allay suspicion" of drug trafficking).

15

Even assuming the stop of Corman's vehicle was based upon only a traffic violation, the stop was still not impermissibly prolonged because the officers performed the investigation within the "dead time" of the traffic stop. *Howard*, 815 F. App'x at 75.  During the evidentiary hearing, after review of his body cam footage, Officer Zink testified that the stop began around 1:08:58 p.m. (R. 79 at Page ID 376).  At 1:11:57, Officer Barkley transmitted the first driver's license information to dispatch, and dispatch began searching the database.  (*Id.* at Page ID 395).  At 1:12:08 p.m. the dispatcher ran a second driver's license through the database. (*Id.*).  At 1:16:32, the dispatcher started searching Corman's vehicle's license plate through a database.  (*Id.* at Page ID 396-97).  Officer Zink agreed that the free air sniff occurred "within seconds of [the] time stamp here of 13:12:53."  (*Id*. at Page ID 378).  As a result, Officer Zink's K-9 partner alerted him to the potential presence of narcotics before the dispatcher had begun to run Corman's license plate, and well before Officer Barkley was informed of the results of said database search.[8]  (*Id.* at Page ID 397-98).  As such, Officer Zink's K-9's free air sniff during the "dead time" while Officer Barkley was completing "a task related to the traffic violation" was permissible under *Howard*.  Regardless of the haste of the officers here, since they had a reasonably articulable suspicion that Corman was drug trafficking, Sixth Circuit caselaw allows for a delay of at least up to 45 minutes to investigate. *See United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (finding that police had reasonable suspicion to detain suspect for 30-45 minutes while they waited for police to bring a drug detecting K-9); *see also Salas*, 820 F. App'x at 412 ("[O]fficers may still extend a stop to conduct a dog sniff when such action is supported by reasonable suspicion of criminal activity.").

---

[8]   At the April 24, 2024, evidentiary hearing, Officer Barkley answered in the negative when asked if he would ever release a subject of a traffic stop before hearing back from dispatch regarding the license plate. (R.79 at Page ID 398-99).

Officer Zink also testified as to he and his K-9 partner's certification through NAPWD. (*Id.* at Page ID 364-66). As a result, Zink's K-9 partner signaling to the presence of narcotics in Corman's vehicle provided probable cause to search Corman's vehicle. *See Florida v. Harris*, 568 U.S. 237, 246-47 (2013) (A dog's positive alert to narcotics can serve as probable cause to search "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting."); *see also United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012) (Holding that an alert by a "properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance.") (citations omitted).

The United States also attempts to give alternative reasoning to justify the search of Corman's vehicle, offering the automobile exception under *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) and the search incident to arrest exception under *Arizona v. Gant*, 556 U.S. 332, 343 (2009). (R. 83 at Page ID 435-36). Here, the search of Corman's vehicle occurred before his actual arrest, such that the search was not incident to his arrest, but rather his arrest was incident to the search of his vehicle. (R. 79 Page ID 303, 375). The automobile exception, since it requires the same probable cause as already discussed above, would provide alternative justification for the search of Corman's vehicle.

Defendant's claim that the lack of a resulting traffic citation for failure to signal demonstrates that the officers had "abandoned" the traffic stop in favor of conducting a drug investigation. (*See* R. 87 at Page ID 444-45). The above examination of the record demonstrates that the officers had not abandoned the investigation into the traffic violation; Officer Barkley was submitting information and waiting for search results from dispatch the entirety of the time Corman and Baker were stopped. (*See generally* R. 79 at Page ID 376-98).

Thus, even if the purpose of the traffic stop was to merely investigate the traffic infraction, that purpose would not have been concluded by the time Officer Zink acquired reasonable

17

suspicion to prolong the stop under *Rodriguez*. Instead, the free air sniff occurred "within the proper duration and scope of a traffic stop." *Whitley*, 34 F.4th at 530.

### III. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, Corman has not demonstrated that he is entitled to the suppression of evidence obtained during the traffic stop. Accordingly, **IT IS RECOMMENDED** that Corman's Motion to Suppress (R. 59) **be denied**.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days of the date of service or further appeal is waived. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 474 U.S. 140, 142 (1985); *United States v. Walters*, 638 F.2d 947, 950-51 (6th Cir. 1981).

Signed this 30th day of August, 2024.



Signed By:
*Candace J. Smith*
United States Magistrate Judge

G:\Judge-CJS\DATA\Orders\criminal cov\2023\23-37-DLB-CJS R&R re MTS final.docx